# Title IX Complaint

## United States District Court for the District of Connecticut

Stephanie AlGhani,
Plaintiff,

v.

Board of Education of the Town of Avon,

200 Fisher Drive

Avon, CT, 06001
Defendant.

JAN 27 2026 AM 9:54
FILED-USDC-CT-HARTFORD

Case No. _____

# COMPLAINT

Plaintiff alleges:

## I. Jurisdiction and Venue

1.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

2.  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343, which provides original jurisdiction over actions to redress the deprivation of rights secured by federal civil rights laws.

3.  Venue is proper in this District of Connecticut pursuant to 28 U.S.C. § 1391 all events giving rise to the claims occurred within this District and the Defendant resides in this District.

## II. Parties

4. Plaintiff Stephanie AlGhani is a former employee of Avon School District, a parent of students enrolled in the District residing in Avon, Connecticut.

5. Defendant Board of Education of the Town of Avon is a recipient of federal financial assistance and subject to Title IX.

## III. Facts

6. In June 2025, Plaintiff disclosed to an English Teacher that multiple assigned books in the curriculum—including *The Catcher in the Rye* and *The House on Mango Street*—were personally triggering for her. **(See Exhibit A)** The teacher directed Plaintiff to speak with the English Coordinator. Plaintiff then disclosed to the English Coordinator in writing that the cumulative content of the assigned literature was causing trauma-based distress connected to Plaintiff's own sexual abuse history. **(See Exhibit B)** This trauma disclosure constituted sex-based safety notice under **Title IX** and required an accommodation or trauma-informed response. Instead, both staff members framed the concern as a curriculum issue, and the Coordinator directed Plaintiff into the book-challenge process, a procedure designed for content objections rather than disclosures involving trauma, psychological harm, or sex-based sensitivity.

7. On August 28, 2025, Plaintiff was assigned as a para educator to an 11th-grade English class that was reading *Speak*, a novel involving themes of date rape, self-harm, and trauma. Plaintiff privately informed the teacher that she felt uncomfortable being in a classroom discussing a book about rape. The teacher responded, "We have to get out of our comfort zone," and then turned his back to end the conversation. The following morning, Plaintiff emailed the teacher **(See Exhibit C)**, explaining that this type of language mirrored language used by sexual groomers in her personal history, that she was raising a **mandated-reporter concern** because no parental permission slips had been provided for sexual content, and that she would be bringing her concerns to the Principal. The teacher did not respond to Plaintiff's disclosure or her stated safety concerns.

2

8. On August 29, 2025, Plaintiff emailed the Case Manager, Social Worker, and Para educator Coordinator regarding concerns about the book *Speak*, which was assigned in the 11th-grade English classroom to which she had been placed. **(See Exhibit D)** Plaintiff stated that she could not go to class because she was preventing herself from "going to a dark place." Plaintiff explained that the teacher had not provided parental permission slips for material containing sexual content involving minors and that, in a private conversation, the teacher told her that "we need to get out of our comfort zone," a grooming tactic she recognized from her personal history as a sexual abuse survivor and disclosed as such in the same email. This communication constituted Plaintiff's first formal complaint related to the 11th-grade English Teacher. Plaintiff was directed to bring the matter to the High School Principal.

9. After being directed to the High School Principal, Plaintiff emailed the Principal stating that she did not feel comfortable returning to the assigned classroom while the book *Speak* was being read or discussed. The Principal responded that part of the role of staff was to remain with their assignments "even when the material may feel challenging." Plaintiff clarified that, as a mandated reporter, the sexual nature of the book required formal parental permission because minors were involved, that placing such content in the curriculum without safeguards was inappropriate, and that English teachers should not replace psychologists or therapy. Plaintiff further stated that the classroom was not a safe setting for the topic of rape. The Principal did not provide any trauma-informed guidance or accommodation options and instead instructed Plaintiff to attend a meeting scheduled immediately after the second English class Plaintiff had already indicated she could not safely attend. **(See Exhibit E)**

10. On September 2, 2025, Plaintiff attended the English class she had previously sought to be removed from, as she was becoming increasingly distressed by the situation. During this class, the teacher distributed pre-reading prompts that included the question: "A new girl has transferred to your school. As she passes through

the hall, you overhear some boys and girls in your class whisper that she is a slut. How do YOU respond?" **(See Exhibit F)** Plaintiff found this prompt disturbing. At one point, Plaintiff asked the teacher whether he had experienced trauma in high school, and he responded, "Everyone has trauma." Plaintiff clarified that she was referring to "real trauma" and asked whether he would be telling students that the assigned book involves rape and whether he would be providing trigger warnings. The teacher replied, "It's not even that bad." At some point during the class, the English Coordinator entered the room, appeared to be monitoring Plaintiff's behavior, and then left. Plaintiff dismissed herself from the classroom, and the Coordinator returned and spoke with the teacher for approximately five minutes. Plaintiff did not re-enter the classroom until the Coordinator left. The teacher then used an acute trauma statement from the book—referencing a stomachache —for a grammar lesson. Plaintiff stated aloud that reading the book also gave her a stomachache, and the teacher glared at her. This incident was later described in a formal statement submitted to the Superintendent on October 18, 2025. **(See Exhibit G)**

11. On September 2, 2025, immediately following the English class, Plaintiff attended a meeting with the High School Principal to address her concerns. When Plaintiff indicated that she had something to say, the Principal responded by stating that Plaintiff would "have a problem with [her] job" and accused Plaintiff of "blurring" her roles as an employee and a parent, even though Plaintiff's disclosure did not involve her own child. Feeling threatened and not understood, Plaintiff excused herself from the meeting to take her lunch break before her scheduled time ended.

12. On the morning of September 3, 2025, frustrated that her concerns were not being heard, Plaintiff sent an email to the High School Principal and Superintendent attaching a letter titled *Do Not Speak* **(See Exhibit H)**, in which she disclosed that she is a survivor of sexual grooming and stated that the conditions she was experiencing felt similar. Before the Principal had opened the email near the start of the school day, the Principal approached

4

Plaintiff in the hallway and stated that her schedule would be changed beginning Thursday, September 4, removing her from the English class. Plaintiff told the Principal not to threaten her job and explained that she was experiencing a trauma response.

13. Later that week, after Plaintiff sent the *Do Not Speak* letter, Central Office contacted her during class and scheduled a meeting for Friday, September 5, 2025, stating that it would include the Superintendent and her para educator union representatives. Nervous about the meeting, Plaintiff texted a union representative to ask whether the Principal would be present but received no response, leading her to believe the meeting would address her conflict with the Principal. When Plaintiff arrived at Central Office on the afternoon of September 5, the para educator representatives appeared angry, and Plaintiff began to feel she was in trouble. In the hallway, the Assistant Superintendent informed her that the Superintendent would not be attending. During the pre-meeting with the union representatives, the discussion quickly shifted into a disciplinary tone, with one representative repeatedly stating she was "trying to save [Plaintiff's] job." When Plaintiff expressed that she felt the representative was not on her side, the Avon para representative responded angrily that Plaintiff "doesn't know her" and insisted she was there to save Plaintiff's job. The representative yelled at Plaintiff for sharing her "ideas" about curriculum and told her she "could not change society." Whenever Plaintiff attempted to explain that she was seeking help as a triggered survivor and that the Principal had handled the situation poorly—including attempting to show her trauma-disclosure emails—the representative stated that was not her responsibility and that she was only there to save Plaintiff's job. She also stated that there was a "procedure" for complaints about the Principal but did not explain what that procedure was. A second male union representative discussed possible accommodation options with Plaintiff, and during the meeting asked how many people had received her *Do Not Speak* letter. He stated that Plaintiff would face disciplinary action for "not handling [herself] well." Plaintiff

realized that the meeting was not the fact-finding discussion she had been led to expect and asked, "Why am I here? Am I being ambushed?" After these discussions, the representative stated that he believed the only viable option was for Plaintiff to resign. Feeling pressured and with no meaningful accommodation or reassignment options being offered, Plaintiff agreed.

14. After her coerced resignation, and unaware that the actions taken against her constituted retaliation, Plaintiff forwarded her grooming-survivor disclosure letter titled *Do Not Speak* **(See Exhibit H & I)** to the entire English Department on September 6. In the accompanying email, Plaintiff identified herself as a trauma survivor and requested that teachers provide parental permission slips before assigning literature containing explicit material such as sexual content or graphic violence. Plaintiff also stated that she had been "forced to resign, or face disciplinary action from Stephanie Lockhart," documenting her understanding of the circumstances immediately after the September 5 meeting. No teacher responded directly.

15. The Superintendent later contacted Plaintiff by email on September 8 to schedule a new meeting and stated that teachers had forwarded Plaintiff's message to her. In this email, the Superintendent characterized Plaintiff's disclosure as "concerns… from the curriculum angle" and indicated that the purpose of the new meeting was to discuss "your concerns regarding the curriculum," despite Plaintiff never raising curriculum objections and instead reporting a trauma-based safety concern related to sexually explicit and trauma-triggering content in the curriculum. In the same message, the Superintendent stated that she also wanted to "find out what happened at AHS," which aligned with Plaintiff's initial understanding that the September 5 meeting had been intended to gather information. The Superintendent further stated that she had been unable to attend the September 5 meeting because she was in the emergency room following an accident on her way to work. She nevertheless rejected Plaintiff's understanding of the September 5 meeting and denied that it had been disciplinary,

calling Plaintiff's understanding a "misinterpretation," even though Plaintiff had never been told the meeting was disciplinary and had reasonably assumed it was fact-finding because she believed she had done nothing wrong. **(See Exhibit J)**

16. Following her resignation, Plaintiff met with the Superintendent and her assistant on September 11, 2025, to discuss the Principal's, Teacher's, and Coordinator's handling of her concerns. When discussing the book *Speak* and the passage involving self-harm, the Superintendent downplayed the content, stating to her assistant taking notes that the character "didn't actually commit suicide." During the meeting, the Superintendent defended certain administrators, noting that the Principal had removed Plaintiff from the English class by September 4, but disregarding the retaliation Plaintiff reported occurred on September 5. Plaintiff, still in a traumatized state, was not yet able to articulate the full connection between her disclosures and the events that followed; she later made these connections after replaying the September 5 meeting and rereading the relevant emails. In her distressed state, Plaintiff remarked, "Now I know why everyone hates her," reflecting her awareness of widespread staff dissatisfaction with the Principal even though she was not yet able to articulate the broader pattern of concerns. The Superintendent further defended the English Teacher and Coordinator based on a narrative she had received from them that Plaintiff was "scaring the students," reflecting institutional bias and a failure to acknowledge or correct procedural deficiencies.

17. During the meeting, Plaintiff also explained that other parents had attempted to raise concerns about the same book. She described the psychological impact the book had on her as a trauma survivor and provided the Superintendent with her personal copy of *Speak*, which contained handwritten notes regarding self-harm, PTSD, and teacher–student boundary issues. Plaintiff further shared that her son had overheard a group of boys in the locker room referring to *The House on Mango Street* as "disgusting," noting that students

themselves recognized the inappropriateness of certain assigned texts and that the District appeared dismissive of these concerns.

18. After realizing that no corrective action had been taken, despite the Superintendent appearing to recognize and agree with certain points during the September 11 meeting, Plaintiff sought information from the Superintendent's office on September 26, 2025, regarding the District's Title IX procedures. On September 29, 2025, the Superintendent's assistant instructed Plaintiff to "file a complaint with the superintendent," which is not a Title IX-compliant process. This response demonstrated a lack of staff training and misdirection away from the Title IX Coordinator. **(See Exhibit K)**

19. On September 29, 2025, after her resignation, Plaintiff notified the Board of Education of sex-based concerns and retaliation involving the High School Principal. **(See Exhibit L)** The Board Chair responded, "Thank you so much for reaching out to the Board. We cannot engage in personnel matters outside of a formal hearing; however, I have forwarded your communication to the superintendent and Mr. Medic. I have asked Bridget to follow up on the matter," thereby characterizing Plaintiff's Title IX disclosure as a personnel matter rather than a sex-based discrimination issue. Although Plaintiff was provided Title IX forms, the misclassification and subsequent handling made clear that the District did not have a functioning or compliant Title IX grievance process and was not equipped to administer one.

20. On October 5, 2025, Plaintiff began raising concerns regarding her son's exposure to literature containing sexual content by emailing his English Teacher and explaining that *The House on Mango Street* was disturbing due to its sexual-content themes. Plaintiff explains to teacher how this book disturbed her personally while working in a Freshman class 2024-2025 school year, and that her son was also warned by an older group of boys in the locker room how disgusting it was. **(See Exhibit M)**

21. On October 6, 2025, the Vice Principal—who also serves as the High School's Title IX Coordinator—responded that if "instructional material is particularly triggering for [Plaintiff's son][1], based on his own previous experiences," the school could consider accommodations. This response conditioned accommodations on disclosure of the student's trauma history, violating pupil-privacy protections and mischaracterizing Plaintiff's request as dependent on personal trauma rather than curriculum content. **(See Exhibit N)**

22. On October 7, 2025, Plaintiff emailed the Superintendent to file an official complaint regarding the 11th-grade English Teacher and English Coordinator. **(See Exhibit O)** In her complaint, Plaintiff reported that when she raised concerns about the assigned book *Speak*—including its themes of rape, self-harm, and trauma—she was stonewalled, monitored in class by the English Coordinator, and later mischaracterized as "acting out" when she attempted to ask questions. Plaintiff also informed the Superintendent that multiple parents had contacted the English Teacher with concerns about the book and that a former parent had previously expressed similar concerns to a Special Education teacher. Plaintiff stated that she was preparing a detailed written account of the September 2 incident and her interactions with staff, which she later submitted on October 18, 2025. **(See Exhibit G)**

23. On October 7, 2025, Plaintiff emailed the Members of the Board of Education, raising concerns about sexual harassment themes and rape scenes in *The House on Mango Street*. The Board Chair responded by writing, "I am including Dr. Carnemolla on this response, so that you know it has been shared with administration. All the best," thereby forwarding Plaintiff's concerns back to the administration rather than addressing them at the Board level. **(See Exhibit Z)**

24. On October 9, 2025, the English Coordinator emailed Plaintiff stating that she—not the teacher—should be the point of contact

---

[1] Plaintiff refers to her minor son as "Plaintiff's son" to protect his identity

for curriculum concerns in response to Plaintiff's original accommodation request to her son's teacher. **(See Exhibit M)** In Coordinator's e-mail, she again directed Plaintiff to complete a Form 6161 book-challenge request. **(See Exhibit P)** This routed Plaintiff back into the same book-challenge process Coordinator directed when Plaintiff disclosed personal trauma in June 2025. Plaintiff submitted the Form 6161 the next day, October 10. **(See Exhibit II)** Rather than working with Plaintiff to provide an alternative assignment—an option the District later represented as available in its formal response to the book challenge ("Considering how the themes in the book are taught, the support provided to students, and the options available for students who request an alternative assignment.") **(See Exhibit Q)**—the District's November 14 response in Exhibit Q concerned the same book, *The House on Mango Street*, for which Plaintiff had requested an accommodation for her son. Instead of accommodating her request, the District required Plaintiff to pursue a formal challenge controlled by the same individuals from whom she had initially sought an accommodation and who had ignored her request, leading her to file formal complaints against them. This created a circular process and a conflict of interest that allowed those individuals to shape the narrative surrounding her concerns.

25. October 9, 2025 Plaintiff formally submitted her first Form 6161 book-challenge request regarding the book *Speak*. **(See Exhibit HH)**

26. On October 18, 2025, Plaintiff submitted to the Superintendent a detailed written account of the September 2 incident and her interactions with staff. In this statement, Plaintiff directly addressed the Teacher's and Coordinator's claim that she had "scared the students." Plaintiff explained that the September 2 class had been her final interaction with the Teacher and that, while he might attempt to claim she upset the class, the students—having known her for three years—had rarely seen her upset and could recognize that she was acting differently. Plaintiff stated that she

never raised her voice or behaved in an undignified manner. She further requested that the District not allow the Teacher to speak for the students and encouraged the District to ask the students directly for their perspective, offering to provide names upon request while declining to list them in the document to protect their privacy. **(See Exhibit G)**

27. On October 21, 2025, Plaintiff publicly addressed the Board of Education, stating that the themes in the assigned curriculum books constituted "not sexual abuse prevention, this is normalization," a statement captured in the Nutmeg TV recording at approximately 29:20. The official meeting minutes summarized her remarks only as: "Ms. Stephanie Alghani spoke about 3 novels that she feels should be taken off the curriculum at the high school." **(See Exhibit W)** This reduction of her concerns reflected a pattern throughout the fall in which the Board Chair characterized Plaintiff's safety-based and statutory concerns as mere book-challenge issues, even when Plaintiff presented information suggesting potential violations of the Protection of Pupil Rights Act, 20 U.S. Code § 1232h. **(See Exhibit Y)** In a November 7 email, the Board Chair wrote: "Given that the Board of Education may be called upon to serve as an impartial panel to hear any appeals under Policy 6161, the Board must refrain from rendering any judgment on these matters at this time." **(See Exhibit X)**

28. On November 3, 2025, when Plaintiff requested the names of the individuals serving on the book-challenge committee for *Speak*, the Principal initially refused to provide this public information. **(See Exhibit R)** In its formal response to Plaintiff's book-challenge submission, the District relied on the subjective term "age-appropriate," a standard not grounded in any child-safety statute or mandated-reporting requirement, and did not address the safety issues Plaintiff raised. **(See Exhibit S)** The District's assertions that "instructional supports" and "available alternatives" existed were misleading in light of of Plaintiff's own experience as a para educator assigned to the 11th-grade English class reading *Speak*. Plaintiff had raised mandated-reporter

11

concerns that no parental permission slips were provided for the book's sexual content involving minors, and she personally observed that no alternative assignment or trigger warning was offered to students. **(See Exhibit G)**

29. Throughout Fall 2025, the Superintendent repeatedly attempted to redirect Plaintiff's sex-based and retaliation concerns into informal conversations in which she minimized the conduct, defended the administrators involved, and attempted to elicit sympathy for herself and them. In one phone conversation, the Superintendent suggested that Plaintiff's concerns were upsetting the English teachers, to which Plaintiff responded that her priority was student safety given that students were being assigned books containing rape-related content. On November 6, 2025, the Superintendent sent Plaintiff a detailed email defending the book *Speak* on cultural and instructional grounds, despite Plaintiff's repeated disclosures that the material had re traumatized her. **(See Exhibit T)** These interactions left Plaintiff feeling blamed and unsupported. Plaintiff recognized that the Superintendent was not acting as a neutral or appropriate point of contact for a Title IX matter and therefore began directing her concerns to the Board of Education. The Board declined to intervene and instead instructed Plaintiff to continue working with the Superintendent, despite the Superintendent being the subject of Plaintiff's complaints and having already failed to follow required Title IX procedures.

30. On November 9, 2025, Plaintiff emailed the Members of the Board of Education (excluding the Board Chair) requesting "Board accountability and impartial review," stating that the Board Chair had a reputation for being partial to the Superintendent and reminding the Board that "Your primary duty is to represent the students, parents, and community members of Avon—not to shield administrators from scrutiny." The Board Members forwarded Plaintiff's email to the Board Chair, who responded by stating that she "was not meant to be dismissive, but rather to preserve the integrity of the process set forth in Board Policy 6161, which requires the Board to serve as an impartial panel in the event a

12

parent invokes his/her right to appeal the Superintendent's determination regarding the book in question." The Board Chair further wrote, "After conferring with our legal counsel, I am confident the District has and will continue to comply with the legal mandates of the PPRA." **(See Exhibit AA)**

31. On November 17, 2025, only after Plaintiff stated in an email that FOIA grants access to the names of committee members did the Assistant Superintendent release the identities of the book-challenge committee. **(See Exhibits U & V)** The committee included multiple teachers, social workers, the English Coordinator, and the Principal—individuals who had been aware of Plaintiff's trauma history or had ignored her trauma disclosures, and some of whom were already formally named in complaints submitted to the Superintendent. Their inclusion on the committee created the appearance that appropriate safety protocols had been followed when Plaintiff had previously disclosed personal trauma to them and no such protocols were implemented. The initial refusal and subsequent disclosure reflected a lack of transparency and a compromised review process, further demonstrating the futility of seeking relief within the District.

32. On November 17, 2025, after realizing that the formal response to her book challenge was not impartial and that the committee included the same English Coordinator who had dismissed her concerns and ignored her disclosures as a sexual abuse survivor since June 2025, Plaintiff again requested that the Board of Education provide an impartial review. The Board Chair had previously stated on November 10 that "the process set forth in Board Policy 6161… requires the Board to serve as an impartial panel in the event a parent invokes his/her right to appeal the Superintendent's determination regarding the book in question." **(See Exhibit AA)** In her November 17 email, however, the Board Chair wrote, "Please be advised that Policy 6161 limits any appeal to the Board of Education and does not require the Board to delegate such responsibility." **(See Exhibit BB)** The Board Chair

stated that she would bring Plaintiff's request for an impartial investigator to the next scheduled Board meeting on December 16.

33. On December 15, 2025, despite recognizing that the Superintendent was not acting as a neutral or appropriate point of contact for a Title IX matter, Plaintiff continued to communicate professionally with her to secure an accommodation for her son. The District ultimately granted the accommodation on December 19, but only after Plaintiff invoked religious-freedom protections, underscoring the District's unwillingness to address concerns related to sexual content unless framed under a different legal category. **(See Exhibit CC)** The December 9 formal response from the Principal, concerning the same book, *The Catcher in the Rye*, for which Plaintiff had requested an accommodation, stated that "instructional supports" and "available alternatives" existed, despite the District having declined to offer any alternative when Plaintiff initially requested one. **(See Exhibit DD)** In this same December 19 email, the Superintendent also informed Plaintiff that the Board had decided to appoint an independent hearing officer for book-challenge appeals.

34. On January 4, 2026, the Board of Education was formally advised of Plaintiff's concerns using the correct legal framing, identifying them as Title IX complaints involving the Principal, an English Teacher, and the English Coordinator. The Board Chair again stated that the Board did not have purview over "individual employment matters." **(See Exhibit EE)** Shortly thereafter, the district's attorney responded, stating: "With respect to your Title IX allegations, please know the district takes such allegations very seriously and has appointed an outside investigator, with significant Title IX experience, to investigate your claims. The Board of Education does not have purview over Title IX complaints and therefore a hearing before the Board is not the appropriate forum. Attorney Johanna Zelman of Ford Harrison has been appointed to this matter, and she too will contact you under separate cover to arrange for an interview." **(See Exhibit FF)** Although the district attorney informed Plaintiff that the district

had hired an external Title IX investigator and provided the investigator's name, more than eighteen days passed without any correspondence from the investigator. In light of this lack of follow-up, together with the district's prior misclassification of her disclosures and other procedural irregularities, Plaintiff no longer had confidence that the district would conduct a proper Title IX investigation. Plaintiff therefore proceeded with filing this federal civil complaint.

35. On January 20, 2026, Plaintiff submitted a 41-page appeal to the Board Members and the independent hearing officer titled "Trauma-Centered Content in English Language Arts and Conflicts With Student Safety Standards." The appeal included exhibits demonstrating how the district had repeatedly defended and implemented an English Language Arts curriculum containing sexual and trauma-centered content, grounded in a cultural belief that exposure to "trauma instills empathy." In her accompanying email to the Board Members, Plaintiff respectfully requested no response, explaining that she needed to prioritize her mental health after months of unsuccessful attempts to obtain a resolution within the district. **(See Exhibit GG)**

36. At the end of the 2024–2025 school year, the District conducted a staff climate survey. Paraeducators were not included in the survey, which caused frustration among them, as they had their own workplace concerns. Staff members discussed that the survey results reflected significant negative feedback about leadership at the high school. According to staff discussions, the Principal responded to the feedback by stating, "I feel like this is personal." It was also commonly known among staff that the Principal frequently threatened discipline under the phrase "not handling the situation well." The survey results and the exclusion of para educators demonstrated that the District had notice of a deteriorating environment and failed to take corrective action.

37. On November 19, 2019, during a public Board of Education meeting—recorded on Nutmeg TV at approximately 1:22:00—a

forensic psychiatrist provided testimony warning of the psychological risks of exposing students to trauma-centered literature and media, specifically referencing the same book that later triggered Plaintiff. This testimony was presented directly to the Superintendent and the Board Chair, both of whom were present at the meeting. Despite this expert warning, the District continued to assign the book in the curriculum in subsequent years. These facts show that District leadership had prior notice of the risks associated with the material well before Plaintiff's disclosure and that the harm Plaintiff experienced was avoidable.

## IV. Causes of Action

## Count I – Title IX Sex Discrimination Under Title IX (20 U.S.C. § 1681 et seq.)

38. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

39. Defendant is a recipient of federal financial assistance and is subject to Title IX and its implementing regulations.

40. Plaintiff repeatedly disclosed trauma-based distress connected to her history as a survivor of sexual grooming and sexual abuse. These disclosures constituted notice of sex-based safety concerns under Title IX.

41. Defendant, through its employees and administrators, had actual knowledge of Plaintiff's sex-based disclosures beginning in June 2025 and continuing throughout Fall 2025.

42. Despite this notice, Defendant failed to provide any trauma-informed response, failed to offer accommodations, and failed to initiate any Title IX-compliant process.

43. Instead, Defendant misclassified Plaintiff's disclosures as "curriculum concerns," "book challenges," or "personnel matters," diverting her into processes that were not designed to address sex-based discrimination or safety concerns.

16

44. Defendant's failure to respond appropriately to Plaintiff's disclosures created and perpetuated a sex-based hostile environment, causing Plaintiff emotional distress, loss of employment, and deprivation of her rights under Title IX.

45. Defendant's actions and omissions constitute deliberate indifference to known sex-based discrimination, in violation of Title IX.

## Count II – Retaliation Under Title IX

46. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

47. Plaintiff engaged in protected activity under Title IX when she disclosed trauma-based distress, reported sex-based safety concerns, and raised concerns about sexually explicit content involving minors.

48. Defendant retaliated against Plaintiff for engaging in protected activity by:

- threatening her job;

- accusing her of "blurring roles";

- monitoring her in class;

- convening a disciplinary-tone meeting;

- pressuring her to resign;

- mischaracterizing her disclosures;

- forwarding her complaints to individuals she had reported;

- denying access to Title IX procedures;

- misdirecting her into non-Title-IX processes.

17

## Count III – Failure to Maintain a Title IX-Compliant Grievance Process

49. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

50. Title IX requires school districts to maintain a functioning, accessible, and compliant grievance process, including:

- a trained Title IX Coordinator;

- clear reporting pathways;

- prompt and equitable response;

- impartial investigation;

- protections against retaliation.

1. Defendant failed to maintain such a process. Staff repeatedly misdirected Plaintiff, provided incorrect information, and routed her into processes controlled by individuals she had reported.

2. Defendant's Board Chair misrepresented the Board's authority by stating that the Board had "no purview" over Title IX, further obstructing Plaintiff's access to a compliant process.

3. Defendant's failure to maintain a functioning Title IX system constitutes an independent violation of Title IX.

## Count IV – Retaliation and Interference Under 42 U.S.C. § 1983

Defendant, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and federal law, including the right to petition for redress, the right to be free from retaliation for protected activity, and the right to equal protection.

## V. Damages

51. Plaintiff seeks compensatory damages for emotional distress, medical expenses, reputational harm, and other losses resulting from Defendant's conduct.

52. Plaintiff seeks injunctive relief requiring Defendant to adopt and enforce compliant Title IX policies, training, and monitoring.

53. Plaintiff seeks attorneys' fees and costs under 42 U.S.C. § 1988 and applicable law.

## VI. Jury Demand

54. Plaintiff demands a trial by jury on all triable issues.

## VII. Prayer for Relief

WHEREFORE, Plaintiff requests judgment against Defendant for:
- Compensatory damages;
- Injunctive and declaratory relief;
- Attorneys' fees, costs, and expenses; and
- Such other relief as the Court deems just and proper.

Respectfully submitted,

Stephanie AlGhani

Plaintiff, Pro Se

740 Lovely Street,

Avon, CT, 06001

1-646-417-2218

stephaniealghani@gmail.com

Dated: January 27 , 2026

19